STATE OF CONNECTICUT *v.* ANDREW OWENS
(AC 18013)

Spear, Dranginis and Dupont, Js.

---

Argued February 13—officially released May 8, 2001

*Del Atwell,* special public defender, for the appellant (defendant).

*Marjorie Allen Dauster,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Robert O'Brien,* supervisory assistant state's attorney, for the appellee (state).

*Opinion*

DUPONT, J. The defendant, Andrew Owens, appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a)[1] and carrying a pistol without a permit in violation of General Statutes § 29-35 (a).[2] The defendant claims that (1) the evidence did not sufficiently establish his guilt beyond a reasonable doubt, (2) certain police testimony at the suppression hearing and prosecutorial misconduct denied him a fair trial, (3) the court (a) improperly failed to declare a mistrial, (b) imposed an excessive sentence and (c) improperly instructed the jury regarding reasonable doubt, (4) he received ineffective assistance of counsel, and (5) the state misused peremptory challenges during jury selection. We affirm the judgment of the trial court.

---

[1] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

[2] General Statutes § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28. . . ."

The jury reasonably could have found the following facts. On February 24, 1992, at approximately 3:30 p.m., the victim, Jose Reynolds, and an individual known to the victim as "Akeem" exchanged words and engaged in a twenty minute fistfight at 86 Bassett Street in New Haven. After the fight, the victim returned to his house at 66 Bassett Street to clean up, where he found two of his brothers, Ralph Reynolds and William Reynolds. As the three brothers began walking back toward 86 Bassett Street where the altercation between the victim and "Akeem" had taken place, a man ran toward them firing a nine millimeter gun several times. One of the bullets struck the victim in the left tricep.

Officers from the New Haven police department responded to the shooting. Paramedics transported the victim to Yale-New Haven Hospital, where he underwent two surgeries during his two week hospitalization. The police ultimately learned that the defendant used the alias "Akeem." They showed a photographic array to the victim and his two brothers, all of whom made positive identifications of the defendant.

The police arrested the defendant, and the state charged him in a three count information.[3] The defendant pleaded not guilty to the three counts. At trial, the victim and his two brothers each made an in-court identification of the defendant as the shooter. The jury returned a verdict of guilty on counts one and three, assault in the first degree and carrying a pistol without a permit, respectively. The court sentenced the defendant to a term of twenty years on count one and five years, consecutive to count one, on count three, for a total effective sentence of twenty-five years incarceration. This appeal followed. We will provide additional facts as needed.

---

[3] The three counts were assault in the first degree, attempt to commit assault in the first degree and carrying a pistol without a permit.

I

The defendant first claims that the evidence did not sufficiently establish his guilt beyond a reasonable doubt.[4] Our standard of review is well settled. In reviewing an insufficiency of the evidence claim, we invoke a two step inquiry. First, we review the evidence in a light most favorable to sustaining the verdict. Second, we decide whether the jury reasonably could have concluded as it did, given the facts and reasonable inferences drawn therefrom. *State* v. *Hopkins*, 62 Conn. App. 665, 670, 772 A.2d 657 (2001).

The defendant specifically asserts that three factors render his conviction infirm: The victim's intoxication at the time of the shooting; the eyewitnesses' inconsistent and biased testimony; and the state's failure to verify that the defendant had a "lazy eye." The state argues that because each of those assertions attacks credibility determinations made by the jury, as a reviewing court we must defer to such determinations. We agree with the state.

A

At trial, the state introduced the victim's medical record, which disclosed that his blood alcohol level was 0.145 percent upon his arrival at the hospital. The record also contained a statement that the victim had consumed three beers and two shots of whiskey. The victim testified that he was not intoxicated and did not remember telling anyone at the hospital that he had consumed two shots of whiskey. The defense presented Conner Farren, an expert in the treatment of substance abuse, who testified that a blood alcohol level of 0.145 percent indicates gross intoxication. Farren testified further

[1] In his brief to this court and at the time counsel for the defendant moved for a judgment of acquittal, the defendant did not specify which count he claimed was not supported by sufficient evidence. We, therefore, assume that he seeks to challenge his conviction on both counts.

that gross intoxication could lead to perceptual, concentration and memory difficulties, to an inability to focus or to control eye movement and to staggering. Moreover, Farren testified that given the time lapse, it is possible that the victim's blood alcohol level was even higher, perhaps as high as 0.165 percent, at the time of the shooting.

The jury, therefore, heard conflicting evidence as to the victim's level of intoxication and how that level may have affected his ability to perceive and to recall events. The defendant introduced ample evidence to call into question the victim's credibility. That evidence did not, however, obligate the jury to disregard or discredit, in whole or in part, the victim's testimony. It is beyond question that credibility determinations fall uniquely within the province of the jury. *State* v. *Pinnock*, 220 Conn. 765, 786, 601 A.2d 521 (1992); *Nolan* v. *Nationwide Mutual Ins. Co.*, 60 Conn. App. 68, 73, 758 A.2d 432, cert. denied, 255 Conn. 920, 763 A.2d 1042 (2000). Furthermore, the jury's finding of guilt did not hinge solely on the victim's recollection of events, as two other witnesses made positive identifications. We conclude that sufficient evidence existed for the jury to find that the victim's blood alcohol level did not impede his ability to identify the defendant as the shooter.

B

The defendant also argues that the victim and his two brothers offered differing accounts of the shooting. The defendant argues in his brief that those inconsistencies and the fact that the witnesses were the victim's brothers indicate that "[s]urely, such witnesses were not impartial and their credibility [was] suspect." We disagree.

We have reviewed the record and recognize that the victim and the other two eyewitnesses to the shooting did indeed offer conflicting testimony. The accounts

differed as to where the three brothers were heading when the shooting started, when and where the shooter began shooting, how many people were on the porch before the shooting, where the victim's car was parked, who ran in which direction when the shooting started and the March 9, 1992 photographic array identification procedure. The jury knew that the eyewitnesses were the victim's brothers, and it could therefore consider any bias when weighing their testimony. Moreover, the court never precluded the defendant from impeaching the brothers' testimony. Indeed, defense counsel's entire closing argument highlighted the inconsistencies in their testimony.

"[W]e do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Wilcox*, 254 Conn. 441, 464, 758 A.2d 824 (2000). "The resolution of conflicting factual claims falls within the province of the trial court. . . . [W]e cannot retry the facts or pass on the credibility of . . . witness[es]." (Citation omitted; internal quotation marks omitted.) *Crepeau* v. *Gronager*, 41 Conn. App. 302, 310, 675 A.2d 1361 (1996). We therefore conclude that the jury reasonably could have credited the brothers' testimony and identifications of the defendant despite their blood relation to the victim and the inconsistencies about certain events surrounding the incident.

C

The defendant's last claim concerning the sufficiency of the evidence is that the state needed to verify that

the defendant had a "lazy eye" condition. The victim and the witnesses testified that the shooter had a "lazy eye," which was one of the reasons why they had selected the defendant's photograph from the array. According to their testimony, the defendant's photograph in the array depicted him with a "droopy" or "weak" eye. The defendant asserts that he has never experienced any vision problem. The defendant seems to argue that the state needed to present evidence to verify the existence of the condition because the witnesses testified as to that condition. The defendant does not cite, nor has our research unearthed, any law to support that proposition. The witnesses were not medical doctors offering expert testimony as to a documented, verifiable medical condition. The witnesses merely offered testimony that, in their nonexpert opinions, the defendant had one eye that "drooped" more than the other and that that characteristic was one reason why they had selected the defendant's photograph. Whether the defendant had an actual medical condition was not material to the identifications. Such testimony, therefore, cannot sustain an insufficiency of the evidence challenge.

## II

The defendant next claims that certain police testimony tainted the constitutionality of the trial and that the prosecution withheld exculpatory evidence concerning the ownership of the shooter's vehicle in violation of the defendant's right to a fair trial. We disagree.

## A

The following facts are necessary to place the defendant's claim in proper context. Detective Gil Burton of the New Haven police department interviewed the witnesses after the shooting. The witnesses informed Burton that they knew the defendant only as "Akeem." Burton eventually obtained the defendant's real name

and his photograph from police records. On February 29, 1992, Burton presented five photographs to one of the brothers, Ralph Reynolds, who selected the defendant's photograph from the array. On March 9, 1992, Burton presented five photographs to the victim and the other brother, William Reynolds, both of whom selected the defendant's photograph.

The defendant moved to suppress the identifications as overly suggestive and violative of his right to due process. At the June 17, 1997 suppression hearing, defense counsel questioned Burton as to how he had obtained the defendant's real name when he knew only the alias "Akeem." Burton testified that he had used the computer system of the department's investigative service. According to Burton, the system generated the defendant's identity after Burton entered the alias "Akeem." Once he had obtained the defendant's real name, Burton was able to retrieve the defendant's photograph from the police files. Burton used that photograph in the array that he showed to the witnesses and the victim.

On June 19, 1997, the court denied the motion to suppress the identifications. It found that the victim and the two witnesses had selected the defendant's photograph from the photographic array. The court also found that the contents of the photographs were not unnecessarily suggestive. According to the court, each of the three identifying witnesses had a full opportunity to observe the shooter both at the time of the incident and prior to it. The victim's fistfight with the shooter shortly before the incident gave him a full opportunity to observe the defendant, and each of the witnesses had seen the shooter several times in the neighborhood before the shooting. The court also determined that the victim's beer consumption did not affect his ability to identify the defendant as the shooter. Moreover, the court determined that under a totality of the circum-

---

Content:

stances analysis, the out-of-court identifications were reliable.

The defendant's trial began on June 24, 1997, one week after the suppression hearing. At trial, defense counsel again cross-examined Burton as to the procedure that he had used to obtain the defendant's real name. Burton recanted his suppression hearing testimony and offered a wholly different account.[5] At trial, Burton testified that he did not, in fact, use any computer program, nor had the computer been installed in February, 1992, and that he was "pretty sure" that another officer had informed him that the defendant used the alias "Akeem."

The defendant argues that Burton's fabrication of an alias processing program rendered the suppression hearing suspect and tainted the constitutionality of the trial. The defendant did not preserve this claim at trial and it is unclear which type of review he requests. In his brief to this court, we glean no allegation of a violation of a constitutional right, which allegation is neces-

---

[5] The following colloquy occurred on cross-examination:

"Q. Detective Burton, you testified in this courtroom in a hearing about this matter about a week or so ago, is that correct?

"A. Yes.

"Q. All Right. And at that time do you remember answering some questions concerning how you came up with the photograph of 'Akeem'?

"A. Yes.

"Q. Okay. And at that time, you told the court, I believe, that you had run it through a computer?

"A. Yes.

"Q. All right. And you had indicated that you had ran just the name 'Akeem' and, as a result of running the name 'Akeem,' this computer had popped-up Andrew Owens, right?

"A. Yes.

"Q. Okay. So, now your testimony today is that, in fact, that computer was not on line back in that—February of 1992, correct?

"A. Right.

"Q. So, you did not get the name Andrew Owens by using any kind of alias processing?

"A. Right."

sary to invoke review.[6] The defendant makes the broad assertion that Burton's conflicting testimony deprived him of a fair trial. He does not, however, identify a constitutional violation necessary to trigger review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). The defendant here merely has asserted that he was deprived of a fair trial without identifying the constitutional violation that forms the basis for that claimed deprivation.

We note that the defendant's claim seems to involve not a constitutional violation, but an attack on the witness' credibility. Burton's conflicting testimony at the suppression hearing and at trial does not bear on the reliability of the witnesses' identification and the integrity of the verdict. It bears, instead, on Burton's own credibility as a witness. Defense counsel cross-examined Burton and elicited from him an acknowledgement that he had given inaccurate testimony only one week before trial. Defense counsel also referred to Burton's inaccuracies during closing argument. It was for the jury to ascertain the effect of Burton's differing accounts on his credibility. We fail to see, therefore, how Burton's testimony tainted the constitutionality of the trial and deprived the defendant of a fair trial.

We do find it troublesome that Burton's testimony at trial, which occurred only one week after the suppression hearing, reveals that Burton testified as to a nonexistent alias processing computer program operating on a computer that had not yet been installed, all to explain

[6] *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), empowers an appellate court to review an unpreserved claim if the record is adequate for review and the claim is of constitutional dimension. Once a defendant satisfies those two initial requirements, the reviewing court then reaches the merits of the claim. The defendant must demonstrate the existence of a constitutional violation that clearly deprived him of a fair trial. If the claim is subject to harmless error analysis, the defendant must also demonstrate that the state failed to establish harmlessness beyond a reasonable doubt. Id.

the simple and seemingly nonmaterial and innocuous fact of how he had obtained the defendant's real name. We do not agree, however, that his false testimony amounts to an allegation of a constitutional violation that affected the integrity of the verdict.

### B

The defendant also claims that the prosecutor withheld exculpatory evidence regarding the ownership of the shooter's automobile, thereby depriving him of a fair trial. According to the defendant, if the state had investigated who owned the car in which the defendant was located just before the initial altercation with the victim, that investigation would have produced exculpatory evidence. He argues that the state's failure to investigate resulted in a violation of his constitutional right to a fair trial. We disagree.

The following additional facts are necessary to resolve this claim. The victim testified that the defendant had exited a maroon or burgundy car shortly before the fistfight. Other witnesses also testified that a maroon car was parked in the driveway at 86 Bassett Street when the shooting occurred. After Burton arrived at the scene, he checked the maroon car for identification and, finding none, had it towed to police facilities. Burton's police report omits any reference to his checking the plates to determine who owned the car, but Burton testified that he believed that he had done so. According to his testimony, the police never determined who owned the car.

The defendant did not preserve this claim at trial, but urges us to exercise our supervisory power to order a new trial because of the prosecutor's allegedly improper conduct.[7] We will not "invoke our supervisory

---

[7] We note that despite the prosecutorial misconduct label the defendant has put on this claim, his brief suggests that his claim is, rather, one of failure to preserve potentially exculpatory evidence. We are unpersuaded. The defendant has failed to demonstrate that the ownership of the car was material to an issue at trial. See *State* v. *Correa*, 241 Conn. 322, 360–61,

authority to reverse an otherwise lawful criminal conviction absent a showing that the conduct of the prosecutor was so offensive to the judicial process that a new trial is necessary to deter such misconduct in the future." *State* v. *Satchwell*, 244 Conn. 547, 564, 710 A.2d 1348 (1998). The defendant cannot show that the state's failure to ascertain the owner of the maroon car in which the defendant was riding prior to his fistfight with the victim amounted to misconduct.

"We often have stated our standard of review of a claim of prosecutorial misconduct that allegedly results in an unfair trial. [T]o deprive a defendant of his constitutional right to a fair trial . . . the prosecutor's conduct must have so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . We do not focus alone, however, on the conduct of the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct." (Internal quotation marks omitted.) *State* v. *Beall*, 61 Conn. App. 430, 442, 769 A.2d 708, cert. denied, 255 Conn. 954, 772 A.2d 152 (2001).

In his brief, the defendant maintains that the prosecutor "bears the responsibility of convicting a person on the basis of suspicious evidence." While we do not necessarily disagree with that statement, we disagree that the evidence in this case was suspicious. Three individuals positively identified the defendant as the

696 A.2d 944 (1997). In his brief, the defendant suggests that "exculpatory evidence would have been produced had the officer conducted an investigation of the vehicle." The identification of the shooter did not hinge on the ownership of the automobile; rather, it depended on the three witnesses' prior contact with the defendant and their in-court and out-of-court identifications. We see no reasonable probability that knowledge of the owner of the automobile would have affected the result. See id., 361. The defendant cannot, therefore, prevail on a claim of failure to preserve potentially exculpatory evidence.

shooter during both in-court and out-of-court identification procedures. We have reviewed the record and cannot find a single action, let alone an egregious pattern, that remotely could be characterized as prosecutorial misconduct. We therefore decline to exercise our supervisory powers to order a new trial where we find no evidence that the prosecutor engaged in anything but proper conduct.

## III

The defendant's third claim involves several alleged improprieties by the court. He claims that the court, sua sponte, should have declared a mistrial, that it imposed an excessive sentence and that it improperly instructed the jury regarding reasonable doubt. We disagree with each of those assertions.

## A

The defendant argues that the court, sua sponte, should have declared a mistrial in light of Burton's conflicting testimony and the alleged prosecutorial misconduct. Trial counsel never moved for a mistrial, but the defendant surmises now in his brief that "[h]ad [counsel] done so, perhaps the trial court would have been compelled to grant it." We decline the invitation to engage in such a speculative exercise.

The defendant is not entitled to *Golding* review because we cannot determine that any constitutional right was violated. *State* v. *Golding*, supra, 213 Conn. 239–40. Because it is within the court's discretion to grant or deny a mistrial or to order one sua sponte; *State* v. *Phidd*, 42 Conn. App. 17, 38, 681 A.2d 310, cert. denied, 238 Conn. 907, 679 A.2d 2 (1996), cert. denied, 520 U.S. 1108, 117 S. Ct. 1115, 137 L. Ed. 2d 315 (1997); this case is inappropriate for plain error review. Moreover, in light of our conclusion in part II of this opinion that Burton's testimony bore only on his credibility as a witness and not on the reliability of the identifications,

and that the prosecutor did not engage in misconduct, we will not invoke our supervisory powers.

B

The defendant also argues that the court imposed an excessive sentence in retribution for his refusal to accept a plea bargain. There is no record to support his claim.

The court sentenced the defendant to a term of twenty years incarceration for assault in the first degree and a consecutive term of five years for carrying a pistol without a permit. The defendant maintains that the sentence he received was in retaliation for his decision to reject a plea offer.

The defendant failed to raise this claim at trial and therefore has not preserved it for appellate review. In his brief to this court, the defendant does not request *Golding* or plain error review. We agree with the state that the inadequate record renders us unable to ascertain the precise basis for this claim.

In his brief, the defendant argues that "pressure was asserted to convince him to dispense with trial in light of his present term." He also asserts that the court should not have imposed a harsh and excessive sentence as punishment for his refusing to plead guilty. There is no record, however, that establishes either that plea bargaining actually occurred or the content and nature of the plea bargaining that the defendant now challenges. See *State* v. *Fullwood*, 194 Conn. 573, 581, 484 A.2d 435 (1984). It is the defendant's responsibility to provide an adequate record for review. Id. The absence of any record makes it impossible for us to determine whether there was any instigative or vindictive conduct by the judge; see *State* v. *Brunori*, 21 Conn. App. 331, 336, 574 A.2d 222 (1990); or even before which judge the alleged plea bargaining occurred. If the presid-

ing trial judge in fact actively participated in the plea bargaining, which practice is not condoned; see *State* v. *Gradzik*, 193 Conn. 35, 47, 475 A.2d 269 (1984); the fact that the defendant never filed a motion for disqualification of the trial judge suggests that he acquiesced to that judge presiding over the trial. We cannot reach the merits of the defendant's claim because there is no record of any plea bargaining.

## C

The defendant next claims that the court improperly instructed the jury as to reasonable doubt. The state argues that this court recently considered and rejected a similar claim in *State* v. *Green*, 62 Conn. App. 217, 241–45, 774 A.2d 157 (2001). We agree with the state.

The court charged the jury as follows: "This phrase, reasonable doubt, has no technical or unusual meaning. You get the real meaning of the phrase if you emphasize the word reasonable. It is a doubt which is something more than a guess or a surmise. A reasonable doubt is not such a doubt as raised by one who questions simply for the sake of argument, it is not a doubt suggested by counsel which is not warranted by the evidence. A reasonable doubt is a real doubt, an honest doubt, a doubt which has its foundation in the evidence offered in the case or in the absence of evidence. It is such a doubt as in serious affairs which concern yourselves you would heed. That is such a doubt as would cause reasonable men and women to hesitate to act upon it in matters of importance."

The defendant urges review of this unpreserved claim under *Golding*. The record is adequate for our review, and a claim of instructional error concerning the state's burden of proof is of constitutional dimension. See *State* v. *Morant*, 242 Conn. 666, 687, 701 A.2d 1 (1997) (defendant's unpreserved claim of improper jury instruction as to reasonable doubt meets second prong of *Golding*).

The defendant fails, however, to demonstrate that a constitutional violation clearly existed that deprived him of a fair trial.

In reviewing the propriety of a jury instruction, we scrutinize the entirety of the charge rather than in a piecemeal fashion judging the charge in "artificial isolation." *State* v. *Diaz*, 237 Conn. 518, 536, 679 A.2d 902 (1996). We examine the charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. Id., 537. This court and our Supreme Court have rejected challenges to reasonable doubt instructions that indicate that the jury should not equate such a doubt with a surmise, guess, conjecture or a speculation. See *State* v. *Small*, 242 Conn. 93, 114–15 & n.17, 700 A.2d 617 (1997); *State* v. *Butler*, 207 Conn. 619, 634, 543 A.2d 270 (1988); *State* v. *Simms*, 201 Conn. 395, 420, 518 A.2d 35 (1986).

The challenged instruction in this case is almost identical to the language we approved of in *Green*. In *Green*, we stated that "[w]e also repeatedly have upheld the constitutionality of an instruction characterizing reasonable doubt as a real doubt, an honest doubt, a doubt which has its foundation in the evidence or lack of evidence . . . *State* v. *Taylor*, 239 Conn. 481, 504–505, 687 A.2d 489 (1996), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997); see also *State* v. *Hines*, 243 Conn. 796, 816–20, 709 A.2d 522 (1998). Furthermore, both the United States Supreme Court; see *Victor* v. *Nebraska*, 511 U.S. 1, 18, 21, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994); and [our Supreme Court]; see *State* v. *Morant*, [supra, 242 Conn. 688]; *State* v. *Smith*, 210 Conn. 132, 147–50, 554 A.2d 713 (1989); have reached the same conclusion with respect to an explanation that reasonable doubt is a doubt that would cause a reasonably prudent person to hesitate to act in matters of importance." (Internal quotation marks omitted.) *State* v. *Green*, supra, 62 Conn. App. 244. In

light of our reasoning and decision in *Green*, which involved an instruction almost identical to the one here, we conclude that the defendant has failed to show that he was deprived of a fair trial.

## IV

The defendant next claims that he received ineffective assistance of counsel. "Our Supreme Court has consistently concluded that the preferred vehicle for an ineffective assistance of counsel claim is either a petition for a writ of habeas corpus or a petition for a new trial, not a direct appeal. *State* v. *Mason*, 186 Conn. 574, 579, 442 A.2d 1335 (1982); *State* v. *Just*, 185 Conn. 339, 370, 441 A.2d 98 (1981). 'Absent the evidentiary hearing available in the collateral action, review in this court of the ineffective assistance claim is at best difficult and sometimes impossible. The evidentiary hearing provides the trial court with the evidence that is often necessary to evaluate the competency of the defense and the harmfulness of any incompetency.' *State* v. *Mason*, supra, 579." *State* v. *Patrick*, 42 Conn. App. 640, 650–51, 681 A.2d 380 (1996). We conclude, therefore, that the defendant has improperly raised this claim on direct appeal.

## V

In his final claim, the defendant asserts that the state improperly excused the sole remaining African-American venireperson on the basis of race in violation of *Batson* v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).[8] The state argues that the defendant

[8] The United State Supreme Court promulgated a three step evidentiary procedure to determine whether the state's use of a peremptory challenge violates a defendant's right to equal protection. "First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. [*Batson* v. *Kentucky*, supra, 476 U.S. 96–97]. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Id., [97–98]. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. Id.,

is not entitled to review of this unpreserved claim due to the inadequacy of the record. We agree with the state.

The defendant must satisfy the reviewability requirements of *Golding* before we consider his unpreserved claim. He did not object to the state's exercise of any peremptory challenge during voir dire, and the transcripts of the voir dire do not indicate the race of any venireperson. The absence of a record bars our review of this claim.

The judgment is affirmed.

In this opinion the other judges concurred.

[98]." *Hernandez* v. *New York*, 500 U.S. 352, 358–59, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991). Connecticut has adopted a more lenient procedure, abandoning the requirement of a prima facie showing that the prosecutor exercised the challenge on the basis of race. Pursuant to *State* v. *Holloway*, 209 Conn. 636, 646 & n.4, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989), a defendant need demonstrate only that the challenged venireperson belongs to the same cognizable racial group as the defendant.